UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KIMBRA FRACALOSSI,          §
                            §
        *Plaintiff,*         §
                            §
v.                          §       Civil Action No. 3:17-CV-00336-X
                            §
MONEYGRAM PENSION PLAN; VIAD §
CORP; and MONEYGRAM         §
INTERNATIONAL, INC,         §
                            §
        *Defendants.*        §

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kimbra Fracalossi brought this suit against Viad Corp, MoneyGram International, Inc. (MoneyGram), and the MoneyGram Pension Plan under the Employee Retirement Income Security Act of 1974 (ERISA) after she was denied early retirement benefits. Before the Court are MoneyGram's Motion for Summary Judgment [Doc. No. 127]; MoneyGram's Motion to Strike Plaintiff's Experts and Rebuttal Experts [Doc. No. 126]; and Fracalossi's Motion to Strike, Exclude or Limit Defendant's Expert Testimony [Doc. No. 130].

For the reasons explained below, the Court **GRANTS IN PART and DENIES IN PART** MoneyGram's motion for summary judgment, **GRANTS** MoneyGram's motion to strike, and **DENIES** Fracalossi's motion to strike.

## I.       Factual Background

Viad employed Fracalossi from June 17, 1991, to March 31, 2006. Fracalossi held various positions during her time at Viad. Her last position was President and

CEO of Viad's Exhibitgroup/Giltspur division.  She was promoted to this position on June 30, 2002, and served in this role until her resignation on March 31, 2006.  While employed, Fracalossi participated in two Viad-maintained benefit pension plans: the Viad Corp Retirement Income Plan (the Viad Plan) and the Viad Corp Supplemental Pension Plan (the Viad Supplemental Plan).  The Viad Plan allowed participants who had worked at Viad for ten years to start collecting early retirement pension payments at age fifty-five.  Benefits under the Viad Supplemental Plan are triggered by receipt of benefits from the Viad Plan.

On June 30, 2004, Viad transferred sponsorship of the Viad Plan to MoneyGram, and the Plan became the "MoneyGram Pension Plan" (the MoneyGram Plan).[1]  Fifteen days before the effective date of the transfer to MoneyGram, Viad amended the Plan.  Amendment Four ended all service accrual for early retirement for Viad employees, effective June 30, 2004—the date of the transfer.[2]

In 2015, Fracalossi applied to receive these early retirement benefits under the MoneyGram Plan.  On October 15, 2015, UDC Service Center (UDC), the Plan's third-party service provider, denied Fracalossi's application.  UDC stated that Fracalossi's

---

[1] Although financial responsibility for the plan is disputed, Viad is still the plan administrator for the Viad Corp Supplemental Pension Plan.  Doc. No. 96 at 6.

[2] Amendment Four states, in relevant part:

Upon MoneyGram's assumption of Plan sponsorship, Viad Corp and any other entity which is not a Related Party with respect to MoneyGram after the Distribution Date shall cease to be Participating Employers under the Plan.  The Severance from Service Date of any Participant, who is an Employee immediately prior to the Distribution Date but who, as of the Distribution Date, is not an Employee of MoneyGram or a Related Party with respect to MoneyGram, shall be the Distribution Date.  As soon as practicable after the Distribution Date, the Chief Executive Officer of MoneyGram (or his/her delegate) shall designate, effective as of the Distribution Date.

Doc. No. 129 at 153.

employment as CEO of Exhibitgroup/Giltspur did not count as "Service" under the Plan's definition of "Eligible Employee" and noted that the Plan specifically stated that employees of the Exhibitgroup/Giltspur division did not qualify as Eligible Employees. She appealed. The Benefit Plan Administrative Committee upheld the denial on the same basis on February 5, 2016. The Committee's letter reiterated MoneyGram's position that Fracalossi was ineligible for benefits because she was not an Eligible Employee.

Fracalossi's attorney later sent MoneyGram a settlement offer letter contending that Fracalossi's work at Exhibitgroup/Giltspur did not preclude her from receiving Plan benefits because service continued to accrue under the plan even as an ineligible employee. In response, MoneyGram again refused to overturn the denial of benefits and explained that, notwithstanding its basis for denial, Amendment Four of the Plan precluded Fracalossi from receiving benefits—which Fracalossi says was the first time Amendment Four had been raised as a reason for denial.

In 2017, Fracalossi sued Viad, MoneyGram, and the MoneyGram Plan in this Court. Fracalossi's claims against Viad were dismissed in a prior order.[3] In her Fourth Amended Complaint, Fracalossi brings two ERISA claims. First, she claims that MoneyGram denied her the right to have her work at the Exhibitgroup/Giltspur division count toward her early retirement eligibility. And second, she claims that MoneyGram breached its fiduciary duties to her by failing to inform her of Amendment Four or its effect and misrepresenting that her service continued to

---

[3] Doc. No. 95.

3

accrue in its summary plan descriptions.[4]  Because she lacked notice of the amendment, Fracalossi argues that she was not aware that she had stopped accruing service toward early retirement.  Had she been aware of Amendment Four, she argues, she could have continued working or prepared differently for retirement.  But instead, she retired in 2006 thinking she had ten years of service and lost benefits under the MoneyGram Plan and, consequently, the Viad Supplemental Plan.  Fracalossi seeks relief either through judicial reformation of the Plan or a surcharge against MoneyGram for retirement losses.

MoneyGram now moves for summary judgment on four grounds: (1) MoneyGram correctly interpreted the Plan and denied Fracalossi benefits because she was ineligible under the Plan's terms; (2) MoneyGram did not breach any fiduciary duties owed to Fracalossi; (3) Fracalossi failed to prove actual harm and causation; and (4) as a matter of law, Fracalossi cannot bring claims under both section 1132(a)(1)(B) and 1132(a)(3).

## II.    MoneyGram's Motion for Summary Judgment

### A.    Legal Standard

"Standard summary judgment rules control in ERISA cases."[5]  Summary

---

[4] Plan administrators are required to provide employees with summary plan descriptions under 29 U.S.C. § 1022.  These plan summaries are required to be "written in a manner calculated to be understood by the average plan participant, and . . . [must be] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  29 U.S.C. § 1022(a).  The Supreme Court has clarified, however, that "statements in a summary plan description 'communicat[e] with beneficiaries *about* the plan, but . . . do not themselves constitute the *terms* of the plan.'"  *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 92 n.1 (2013) (alteration in original) (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421 (2013)).

[5] *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324 (5th Cir. 2014) (quoting *Cooper v. Hewlett–Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009)).

judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party,[6] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]  "A fact is material if it 'might affect the outcome of the suit,'" and a "factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[8]

### B.    Analysis

### 1.  Applicable Law

"ERISA is complicated."[9]  There are at least six civil enforcement provisions, and Fracalossi states a claim under two of them.  First, Fracalossi brings a claim against the MoneyGram Plan for denial of benefits under 29 U.S.C. § 1132(a)(1)(B). Under this section, a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[10] To succeed under this section, a beneficiary must show that she qualifies for the benefits provided in the plan.[11]  That is because this section "only authorizes the

---

[6] *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016).

[7] FED. R. CIV. P. 56(a).

[8] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[9] *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016).

[10] 29 U.S.C. § 1132(a)(1)(B).

[11] *See Singletary*, 828 F.3d at 348.

recovery of benefits due under the terms of [the] plan."[12]  "For this cause of action, courts do not look for equitable or other reasons the insurer should provide benefits not strictly owed under the Plan."[13]

And second, Fracalossi seeks equitable relief against MoneyGram for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).  Section 1132(a)(3) allows a participant or beneficiary to bring a civil action "to obtain other appropriate equitable relief (i) to redress . . . violations [of any provision of this subchapter or the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan."[14]  This section is a "catchall" provision that "sounds in equity, [and] creates a broad cause of action for certain injuries that result from . . . other ERISA violations," such as violations of reporting and disclosure requirements and fiduciary responsibilities.[15]

As a threshold issue, MoneyGram claims that Fracalossi may not bring both her section 1132(a)(3) breach of fiduciary duty claim and her section 1132(a)(1)(B) benefits claim.  MoneyGram argues that the claims are duplicative and therefore, her section 1132(a)(3) claim must be dismissed.  Generally, "plaintiff[s] may bring a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) when no other remedy is available."[16]  So, a claim under section 1132(a)(3) generally "may not be maintained

---

[12] *Id.* at 347 (quoting *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 583 (2d Cir. 2006)).

[13] *Id.* at 348.

[14] 29 U.S.C. § 1132(a)(3).

[15] *Manuel v. Turner Indus. Grp., L.L.C.*, 905 F.3d 859, 864–65 (5th Cir. 2018).

[16] *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 733 (5th Cir. 2018) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 510–15 (1996)).

6

when [section 1132](a)(1)(B) affords an adequate remedy."[17]  To determine whether "a given claim is duplicative of a claim that could have been brought under [section 1132(a)(1)(B)]," the Fifth Circuit has instructed lower courts to look at the underlying alleged injury.[18]  "A claimant whose *injury* creates a cause of action under [section 1132](a)(1)(B) may not proceed with a claim under [section 1132](a)(3)."[19]  "Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used."[20]

If a "plaintiff can pursue benefits under the plan pursuant to [§ 1132(a)(1)], there is an adequate remedy under the plan which bars a further remedy under [§ 1132(a)(3)]."[21]  "Simply because a plaintiff does not prevail on a § 1132(a)(1) claim does not make viable an alternative claim under § 1132(a)(3)."[22]  But the Fifth Circuit has also instructed that "claims for injuries relating to [summary plan description] deficiencies are cognizable under [section 1132](a)(3) and not [section 1132](a)(1)(B)."[23]

In line with Fifth Circuit precedent, the Court first examines Fracalossi's injury, whether Fracalossi can pursue benefits under the Plan's terms, and whether that section would provide an adequate remedy.  As explained below, Fracalossi has

---

[17] *Manuel*, 905 F.3d at 865 (cleaned up).

[18] *Id.*

[19] *Id.* (cleaned up).

[20] *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013).

[21] *Innova*, 892 F.3d at 733 (alteration in original) (quoting *LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002)).

[22] *Id.*

[23] *Manuel*, 905 F.3d at 865–66.

no remedy under the Plan's terms. She is ineligible for early retirement benefits under any interpretation of the Plan. Even if the Court accepts Fracalossi's interpretation of the Plan, she is still ineligible for benefits because she stopped accruing service as a result of Amendment Four. The crux of Fracalossi's complaint is that MoneyGram failed to provide notice of Amendment Four or its effect on her benefits. Because Fracalossi cannot pursue benefits under the Plan, section 1132(a)(1)(B) does not provide an adequate remedy. For Fracalossi to prevail, she must prevail on her section 1132(a)(3) claim for breach of fiduciary duty.

## 2. Section 1132(a)(1)(B)

Generally, benefit-denial claims are reviewed *de novo*.[24] But where, as here, the plan gives the administrator "authority to determine eligibility for benefits or to construe the terms of the plan," the Court reviews the administrator's decision for abuse of discretion.[25] Under this standard, "courts are to accord substantial deference to the interpretation the administrator gives the employee benefit plan."[26]

The Fifth Circuit applies a two-step test to determine whether an administrator abused its discretion.[27] First, the Court considers whether the

---

[24] *Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 55 (5th Cir. 1990) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[25] *Encompass Off. Sols., Inc. v. La. Health Serv. & Indem. Co.*, 919 F.3d 266, 273–74 (5th Cir.), *cert. denied*, 140 S. Ct. 221 (2019).

[26] *Jordan*, 900 F.2d at 55 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 111–13); Doc. No. 129 at 74 ("The Committee shall have the sole discretion, authority and responsibility to interpret and construe the Plan and all relevant documents and information, and to determine all factual and legal questions under the Plan, including but not limited to the entitlement of all persons to benefits and the amounts of their benefits. The Committee has discretionary authority to grant or deny benefits under the Plan.").

[27] *Encompass Off. Sols., Inc.*, 919 F.3d at 282.

administrator's interpretation is "legally correct."[28]    If the administrator's interpretation is legally correct, "the inquiry ends, and there was no abuse of discretion."[29]  But if the Court finds that the interpretation is legally incorrect, the Court must then determine whether the administrator's decision was an abuse of discretion.[30]    At the first step, to determine whether the administrator's interpretation is legally correct, the Court must consider three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan."[31]  "The most important factor to consider is whether [the administrator's] interpretation is consistent with a fair reading of the [Plan]."[32]

In her section 1132(a)(1)(B) claim, Fracalossi argues that by interpreting the Plan incorrectly, MoneyGram denied her the right to have her service as CEO of the Exhibitgroup/Giltspur division count toward early retirement eligibility. MoneyGram counters that it interpreted the Plan correctly and denied Fracalossi's early retirement claim because she was not eligible for benefits under the terms of the Plan.   MoneyGram is correct, but for the wrong reasons.

---

[28] *Id.* (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 483 (5th Cir. 2017)).

[29] *Id.*

[30] *Id.*

[31] *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).

[32] *Encompass Off. Sols., Inc.*, 919 F.3d at 282 (cleaned up).

As a preliminary matter, the parties disagree on what version of the Plan applies. MoneyGram denied Fracalossi's claim for early retirement benefits based on its Plan, Amended and Restated as of January 1, 2015, because Fracalossi applied for benefits under the terms of the MoneyGram Plan in 2015.[33]  Fracalossi states in conclusory fashion that the Viad Plan Restated as of January 2001 applies.[34]  But Fracalossi states no factual basis for this assertion, and therefore, the Court finds that Fracalossi has waived this argument.  In any event, it is evident to the Court that the 2015 Plan applies.[35]  Fracalossi applied for and was denied early retirement benefits under the MoneyGram Plan when the 2015 Plan was in effect.  And as MoneyGram notes, it "could not reach back into the superseded version of the plan" in determining Fracalossi's claim for benefits.[36]  Further, Fracalossi had notice that MoneyGram decided her claim under the 2015 Plan because MoneyGram cited the 2015 Plan in its final denial of Fracalossi's claim.

In interpreting a plan, the Court looks to the plan's plain language.[37]  The Court must interpret the plan's terms "in their ordinary and popular sense as would a person of average intelligence and experience.  In other words, [the Court] must

---

[33] Doc. No. 145 at 12.

[34] Doc. No. 144 at 14.

[35] Further, "factual determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion," and the Court does not find this determination to be an abuse of discretion. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).

[36] Doc. No. 145 at 12.

[37] *Crowell v. Shell Oil Co.*, 541 F.3d 295, 314 (5th Cir. 2008).

10

interpret ERISA provisions as they are likely to be understood by the average plan participant, consistent with the statutory language."[38]

To be eligible for early retirement benefits, section 5.2 of the Plan requires a "Participant's Severance from Service Date . . . [to be] on or after the Participant's 55th birthday and after the Participant has completed ten (10) or more years of Service."[39]  Several definitions are relevant here: A "Participant" is defined as "an Employee who has satisfied the eligibility requirements and is participating in the Plan pursuant to Article 2."[40]  And "Severance from Service Date" means "the date the Employee quits, retires, is discharged, or dies."[41]  To determine participation, Article 2 states, in relevant part:

> Any Eligible Employee who as of January 1, 2001 is a Participant shall continue to be a Participant.  Any other Eligible Employee who as of January 1, 2001 has completed a year of Eligibility Service shall become a Participant on January 1, 2001.  Thereafter, any Eligible Employee shall become a Participant on the first day of the calendar month coincident with or immediately following the date as of which the Eligible Employee has completed a year of Eligibility Service. . . .
>   . . . .
> Once begun, participation as an active Participant shall continue until a Participant is no longer an Eligible Employee.  A Participant who is an Employee but not an Eligible Employee or who is a former Employee entitled to receive a Pension under the Plan shall continue as an inactive Participant.  An inactive Participant will, if still an Employee, continue to accumulate Service but not Credited Service.  An

---

[38] *Id.* (cleaned up).

[39] Doc. No. 129 at 33.  Although it is undisputed that Fracalossi's Severance from Service date was before her fifty-fifth birthday, this does not affect her eligibility under section 5.2 of the Plan because she was eligible for the Deferred Vested Pension.  *Id.*  Section 5.3 of the Plan provides that "[a] Participant shall be eligible for a deferred vested pension if the Participant's severance from Service Date is before the Participant's death and after the Participant has completed at least five (5) years of Service."  *Id.*

[40] *Id.* at 20.

[41] *Id.* at 19.

11

inactive Participant does not include a former Employee who had not earned enough Service to become entitled to receive a Pension following termination of employment.[42]

Finally, Eligible Employee is defined under the Plan as "any Employee of the Company (and any Employee of any other Employer who is in a class specified as eligible under an appendix to this Plan), provided that an Eligible Employee shall not include: . . (e) an Employee of Exhibitgroup, Inc. (including former employees of Giltspur, Inc.) or any subsidiary thereof, or an Employee of the division of Viad Corp doing business as Exhibitgroup/Giltspur . . . ."[43]

In its motion for summary judgment, MoneyGram explains that it denied Fracalossi's request for early retirement because she stopped being an Eligible Employee when she became CEO of the Exhibitgroup/Giltspur division of Viad on June 30, 2002. Therefore, MoneyGram found that Fracalossi's Severance from Service date was June 30, 2002, and she stopped accruing service under the Plan at that time.

It is undisputed that on June 30, 2002, Fracalossi became the CEO of the Exhibitgroup/Giltspur division of Viad. Under the plain language of the Plan, MoneyGram correctly determined that Fracalossi was no longer an Eligible Employee as a result of this transition because the definition of Eligible Employee expressly excludes employees of the Exhibitgroup/Giltspur division of Viad. However, the inquiry does not end there. Fracalossi argues that MoneyGram's interpretation is

---

[42] *Id.* at 24.

[43] *Id.* at 18.

12

incorrect for two reasons.  First, she argues that based on the different definitions of Employee and Eligible Employee, she was still able to accrue service as an inactive participant.  And second, she argues that MoneyGram's interpretation "wholly ignores the transfer provision."[44]  The Court addresses each argument in turn.

First, Fracalossi notes that the MoneyGram Plan defines Employee and Eligible Employee differently so that "[o]ne may be an ineligible employee and still be an employee."[45]  This distinction is important because under section 2.1, which details participation requirements, "[a] Participant who is an Employee but not an Eligible Employee . . . shall continue as an inactive Participant.  An inactive Participant will, if still an Employee, continue to accumulate Service but not Credited Service."[46]  So, Fracalossi argues that although she was not an Eligible Employee under the Plan as of June 30, 2002, she was still an Employee who continued to accrue Service.  This is supported by the definition of Employee, which states that

> any person classified by the Company or a Related Company to be a common law employee, including a Leased Employee to the extent required by Code section 414(n) or 414(o) and related qualification requirements affecting the Plan, and also including an individual who is absent from work during a final period of paid vacation which will be followed immediately by such individual's termination of employment. Any determination by a court or governmental agency, whether by adjudication or settlement with the Company, that an individual, who had not previously been classified as a common law employee, is, for other purposes, a common law employee of the Company, shall not affect the Company's classification of that individual for purposes of the Plan.[47]

---

[44] Doc. No. 144 at 11.

[45] *Id.*

[46] Doc. No. 129 at 19.

[47] *Id.*

13

But MoneyGram argues that Fracalossi was no longer an Employee after June 30, 2002, because the "the definition of 'Employee' . . . again circles back to the Eligible Employee requirements [by] requir[ing] a person to meet 'related qualification requirements affecting the Plan . . . .'"[48]  This it does not do.  The quoted language MoneyGram refers to—"related qualification requirements"—modifies the extent to which a Leased Employee is included in the definition of Employee.  It does not modify "common law employee."  Leased Employees are included in the definition of Employee insofar as they are required by the Code sections and related qualification requirements.  This is also evident from the definition of Leased Employee, which contains the same qualifying language.[49]  Further, section 2.1 contains other eligibility requirements—to become a Participant, an Eligible Employee must complete a year of Eligibility Service.[50]  The Court must give effect to all of the Plan's language.[51]  But MoneyGram's interpretation, by giving Employee essentially the same definition as Eligible Employee, renders the definition of Employee mere surplusage and would render the inactive participant provisions of section 2.1 meaningless.  This the Court cannot do.  Rather, the Court must give effect to all of the Plan's language.

---

[48] Doc. No. 128 at 19.

[49] Doc. No. 129 at 20 ("'Leased Employee' means a person who is not otherwise an Employee but whose services are leased by the Company or a Related Company under conditions requiring the person to be treated as an Employee for certain limited purposes pursuant to Code sections 414(n) and 414(o) and related qualification requirements affecting the Plan.").

[50] *Id.* at 24.

[51] *See Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 628 (5th Cir. 2013) ("Construing the statute in this manner would violate the surplusage canon, that every word is to be given effect.").

The next question is whether Fracalossi qualified as an Employee, and if so, whether she accrued enough service to qualify for benefits. That question, in turn, depends on who she worked for.[52] And that question is determined by the definition of "Company."

According to section 1.15, Company can refer to either Viad Corp or MoneyGram depending on the applicable date: "'Company' means Viad Corp prior to the Distribution Date [June 30, 2004] and means MoneyGram International, Inc. on and after the Distribution Date."[53] Applying this definition to the definition of Employee, any person that Viad classified as a common law employee before June 30, 2004, is an Employee for purposes of the Plan. And any person MoneyGram classified as a common law employee after June 30, 2004 is an Employee for purposes of the Plan. The parties dispute when Fracalossi stopped being an Employee, but the Court need not decide the issue here. Both parties agree that on June 30, 2004, Fracalossi stopped accruing service under the terms of the Plan. Whether Fracalossi stopped being an Employee in 2002 or 2004, the result is the same: if Fracalossi's Severance from Service date was June 30, 2002, she would have had 7.38 years of service, and if her Severance from Service date was June 30, 2004, she would have had 9.38 years of service. Neither date gets her to the ten years necessary to qualify for early retirement benefits under the Plan.

---

[52] Doc. No. 129 at 15 ("'Employee' means any person classified by the Company or a Related Company to be a common law employee . . . .").

[53] *Id.*

15

Second, Fracalossi argues that MoneyGram's interpretation ignores the Plan's transfer provision.  The transfer provision, section 2.6, states that "[a] Participant who transfers to a job classification to which this Plan is not applicable or to a Related Company which is not an Employer shall no longer be entitled to be covered as an active Participant under the Plan."[54]  However, it also states that "[f]ollowing such transfer . . . .  Service shall continue to accrue in accordance with section 2.2 . . . ."[55] Section 2.2 explains that "Service is the last period of continuous, uninterrupted employment measured in years, months and days of service as an Employee with an Employer, or a Related Company, commencing with the Employee's Date of Hire and ending on the Employee's Severance from Service Date."[56]

MoneyGram contends Fracalossi did not "transfer[] to a new 'job classification.'"[57]  But the Court does not need to decide this question either. Assuming without deciding that the transfer provision applies to Fracalossi, she would have been classified as an inactive participant as of her transfer—June 30, 2002 because the Plan was not applicable to employees of the Exhibitgroup/Giltspur division of Viad.  And again, both parties agree that she stopped accruing service on

---

[54] *Id.* at 27.

[55] *Id.*

[56] *Id.* at 24.  Employer is defined as "the Company and any Participating Employer." *Id.* at 19. Participating Employer is defined, in relevant part, as "any Related Company that has been designated by the Company and has agreed to participate in the Plan with respect to its Eligible Employees, as indicated in Appendix A."  *Id.* at 20.  The only Participating Employer identified in Appendix A as of January 1, 2015, is MoneyGram Payment Systems, Inc.  *Id.* at 83.  Finally, Related Company is defined, in relevant part, as "a corporation or other employer which is controlled by or under common control with the Company or is in the same affiliated service group or is otherwise required to be aggregated with the Company in accordance with [the Internal Revenue Code of 1986,] section 414."  *Id.* at 22.

[57] Doc. No. 145 at 11.

16

June 30, 2004 as a result of Amendment Four. Therefore, the result under the transfer provision is the same: Fracalossi continued to accrue service as an inactive participant until 2004 at the latest, but she still did not reach the requisite ten years of service.

"[T]o succeed under Section 1132(a)(1)(B), the claimant must show that . . .she qualif[ies] for the benefits provided in that plan."[58] Fracalossi has not done so. She cannot show that she qualifies for benefits provided in the Plan, and in fact, she has admitted that she does not. As she correctly notes, "due to [Amendment Four], she did not accrue the full 10 years of service at the time she actually separated from service"[59] in June 2006 and, "[b]ut for [Amendment Four]" she could have received her early retirement benefits at age fifty-five.[60] This is not a claim she can make under section 1132(a)(1)(B). Therefore, the Court **GRANTS** MoneyGram's motion for summary judgment on Fracalossi's denial of benefits claim.

### 3. Section 1132(a)(3)

Because the Court finds that Fracalossi is not eligible for benefits under the terms of the Plan and that she does not have a claim under section 1132(a)(1)(B), the Court next turns to Fracalossi's section 1132(a)(3) claim.

Section 1132(a)(3) allows beneficiaries to bring a civil action to obtain equitable relief to redress any violations arising under ERISA.[61] Fracalossi seeks two equitable

---

[58] *Singletary*, 828 F.3d at 348 (cleaned up).

[59] Doc. No. 96 at 18.

[60] *Id.* at 28.

[61] 29 U.S.C. § 1132(a)(3).

remedies: judicial reformation or a surcharge against MoneyGram.[62]   Fiduciary duties under ERISA are derived from statute and the common law of trusts.  They include the duties of loyalty and care to ERISA plan beneficiaries.[63]

Three duties are at issue here.  First, ERISA requires the plan administrator to provide a summary description of material modifications to the ERISA plan to the plan beneficiaries within 210 days after the end of the plan year in which the change is adopted.[64]  Second, the United States Supreme Court acknowledged in *Amara* that section 1024(b)(1)(B) imposes a duty on plan administrators to disclose material modifications.[65]  And third, the Fifth Circuit has found, citing the Supreme Court's opinion in *Varity Corp. v. Howe*, that "whenever an employer exercises a fiduciary function, it must speak truthfully."[66]

MoneyGram does not dispute that it is a fiduciary.  But for Fracalossi to recover under section 1132(a)(3), she must also prove that MoneyGram breached one of these duties and that the breach caused her actual harm.[67]  MoneyGram argues

---

[62] Although a surcharge is "a type of monetary remedy against a trustee" the Supreme Court recently held in *Amara* that a surcharge is a potential section 1132(a)(3) remedy.  *Innova*, 892 F.3d at 733 (citing *Amara*, 563 U.S. at 441). Further, judicial reformation is also an equitable remedy as the Court has no authority to rewrite the terms of a plan under section 1132(a)(1)(B).  *Singletary*, 828 F.3d at 349 ("[A] court has no authority under [section 1132(a)(1)(B)] 'to *change* the terms of the plan as they previously existed,' but it only allows enforcing a plan's provisions." (quoting *Amara*, 563 U.S. at 435–36)).

[63] 29 U.S.C. § 1104(a)(1) (2012); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411–12 (5th Cir. 2003).

[64] 29 U.S.C. § 1024(b)(1)(B).

[65]  *Amara*, 563 U.S. at 432.

[66] *Martinez*, 338 F.3d at 425; *see also Varity Corp.*, 516 U.S. at 506 ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." (cleaned up)).

[67] *See Amara*, 563 U.S. at 444.

18

that summary judgment on this claim is appropriate for two reasons.   First, MoneyGram denies that it breached any fiduciary duty.   And second, MoneyGram argues that Fracalossi cannot demonstrate actual harm or causation.  The Court will address each argument in turn.

### a.  Breach

Fracalossi alleges that MoneyGram breached its fiduciary duties by failing to disclose material modifications to the Plan and by affirmatively misrepresenting that service continued to accrue under the Plan for Viad employees.  First, she claims that once MoneyGram took over the Plan in 2004, it failed to timely disclose—and in fact never disclosed—the material modifications to the Plan effected by Amendment Four.[68]   And in 2006, when MoneyGram issued its own summary of material modifications, it failed to disclose the change effected by Amendment Four and failed to correct prior representations about continuing service accrual.   Second, she contends that MoneyGram's summary plan descriptions circulated in 2012 and 2014 falsely represented that all Viad employment counted toward early retirement eligibility and therefore that her service continued to accrue.  Additionally, she argues that when MoneyGram took over, it became responsible for a summary of material modifications that was issued by Viad in 2003.  This summary represented that continued service with Viad would count toward early retirement eligibility.  She

---

[68] Fracalossi does not contest the fact of amendment or the administrator's ability to amend the Plan.

argues that MoneyGram had a duty to correct but failed to correct this misrepresentation.

### i.    Duty to Disclose

MoneyGram does not dispute that it failed to send Fracalossi notice of Amendment Four.  The first Plan document it circulated appears to be a summary of material modifications on or around December 15, 2006, over a year after the ERISA deadline to inform beneficiaries and participants about Amendment Four had passed.[69]  Instead, MoneyGram argues that (1) it was not required to notify Fracalossi of Amendment Four because her service cut off in 2002, two years before the amendment;[70] (2) providing notice of modifications is a ministerial, rather than fiduciary obligation; and (3) the duty stems from an action by Viad, not MoneyGram, and the amendment occurred before MoneyGram took over the Plan.

The Court has already discussed and ruled against MoneyGram's second and third arguments in its previous order.[71]  It explained that, in *Amara,* the Supreme Court acknowledged that section 1024(b)(1)(B) imposes a fiduciary duty on plan administrators to disclose material modifications and that breach of such a duty can

---

[69] The summary of material modifications should have been sent to plan beneficiaries by July 29, 2005—210 days after the end of the plan year in which the change was adopted.  The 2006 document does not disclose the changes made by Amendment Four.  Doc. No. 143 at 314.  Nor does MoneyGram refute Fracalossi's assertion that the 2006 document did not disclose the modifications to service accrual or correct prior representations about service accrual.

[70] Presumably, this is because a summary of material modification does not need to be provided to a beneficiary or participant if the modification does not affect their rights under the plan.  29 C.F.R. § 2520.104b-4(c).

[71] *See* Doc. No. 95.

be brought as a claim by a plan beneficiary under 29 U.S.C. § 1132(a)(3).[72]  And second, this Court explained that although Viad signed Amendment Four, Viad transferred the plan to MoneyGram fifteen days later.  Consequently, MoneyGram, not Viad, was the fiduciary when the ERISA disclosure deadline occurred.[73]

So, the question on MoneyGram's first argument is whether Fracalossi's service stopped accruing in 2002, thereby cutting off MoneyGram's duty to inform her of the amendment.  To answer this question, the Court must turn back to a question it deferred answering in section III.B: whether Fracalossi stopped accruing service under the Plan when she became CEO of the Exhibitgroup/Giltspur division of Viad in 2002, or whether she continued to accrue service until Amendment Four took effect in 2004.  If she continued to accrue service until 2004, MoneyGram had a duty to inform her of changes to the Plan.[74]

The Court finds that under the Plan's participation rules, Fracalossi likely continued accruing Service under the Plan until 2004.[75]  It is clear that Fracalossi

---

[72] *Amara*, 563 U.S. at 443.

[73] Doc. No. 95 at 6, 8.

[74] MoneyGram is correct that it did not have a duty to *personally* inform Fracalossi of the amendment in an individualized manner.  However, Fracalossi does not claim that MoneyGram breached its duty by failing to personally inform her of the amendment; rather, she claims that it breached this duty by failing to comply with its statutory duty to provide all plan beneficiaries notice of material modifications under 29 U.S.C. § 1024(b)(1)(B).

[75] The result is the same under both the Viad Plan, Restated as of January 1, 2001, in place at the time of her promotion, and the MoneyGram Plan, Restated as of January 1, 2015.  It is unclear whether the transfer provision applies to Fracalossi.  It states, "A Participant who transfers to a job classification to which this Plan is not applicable or to a Related Company which is not an Employer shall no longer be entitled to be covered as an active Participant under the Plan."  Doc. No. 129 at 27; Doc. No. 143 at 91.  "Job classification" is not a defined term in the Plan, and there are no other job classifications listed in the Plan.  A job classification is typically thought of as "the grouping of jobs into classes usually on the basis of type of work or level of pay."  *Job Classification*, Merriam-Webster, https://bit.ly/3n9xkqh (last visited Nov. 11, 2021).  There is no evidence that Fracalossi transferred to

21

was not an Eligible Employee as of June 30, 2002, because her division was expressly excluded from the definition of Eligible Employee.[76]  But as explained in the previous section, this does not end the inquiry.  The question is whether Fracalossi was still an Employee, which would allow her to accrue Service as an inactive Participant.  Under the participation rules, a "Participant who is an Employee but not an Eligible Employee . . . shall continue as an inactive Participant. [And] [a]n inactive Participant will, if still an Employee, continue to accumulate Service but not Credited Service."[77]  The question of whether Fracalossi was an Employee when she moved to the Exhibitgroup/Giltspur division of Viad is a factual one.  The definition of Employee "is any person classified by the Company or a Related Company to be a common law employee."[78]  Therefore, if Viad still classified Fracalossi as an Employee when she became CEO of the Exhibitgroup/Giltspur division, this would allow her to continue to accumulate service under the Plan, even after the transition.

---

a new job classification to which the Plan was not applicable.  Instead, Fracalossi transferred to a new *division* to which the Plan was not applicable.  However, it is conceivable that the Exhibitgroup/Giltspur division is a "Related Company which is not an Employer" because a Related Company is "a corporation or other employer which is controlled by or under common control with the Company or is in the same affiliated service group or is otherwise required to be aggregated with the Company in accordance with [the IRS Code]."  The only evidence of the relationship between the two entities is the fact that the Plan says that Viad Corp does business as Exhibitgroup/Giltspur.  This suggests that the Exhibitgroup/Giltspur division is controlled by Viad, but without further evidence, the Court cannot make this determination.

[76] The 2015 MoneyGram Plan, the 2001 Viad Plan, which was in place when she was promoted to the Exhibitgroup/Giltspur division, and the 2003 Viad summary plan description all include this exclusion.

[77] Doc. No. 129 at 24; *see also* Doc. No. 143 at 87 (2001 Viad Plan containing identical language).

[78] Under the 2015 MoneyGram Plan, as explained above, Company means Viad Corp before June 30, 2004.  Under the 2001 Viad Plan, Company means Viad Corp.  Doc. No. 143 at 78.

MoneyGram claims that Fracalossi was "undisputedly" not an Employee as of June 30, 2002.[79] But Fracalossi has provided evidence that after her promotion to CEO of the Exhibitgroup/Giltspur division, she was still a Viad employee. Fracalossi's evidence, including a U.S. Securities and Exchange Commission Form 10-K and copies of her IRS W-2 forms showing the same employer number for Viad Corp and Exhibitgroup/Giltspur is enough evidence to preclude summary judgment on this element.

### ii.    Misrepresentation

As to Fracalossi's misrepresentation claims, Fracalossi points to no case law for the proposition that MoneyGram had a duty to correct Viad's prior statements. She cites her own affidavit repeating this assertion, not case law.[80] But as explained above, MoneyGram does have a statutory and fiduciary duty to disclose material modifications to the plan and a duty to make sure its communications are accurate and truthful.[81] The Court finds that MoneyGram's duty to disclose is the controlling duty in this case.

MoneyGram's motion for summary judgment alleges that it was not responsible for Fracalossi believing that her service continued to accrue for two reasons. First, it argues that Fracalossi was on notice that her service ceased to

---

[79] Doc. No. 128 at 19.

[80] Doc. No. 144 at 24 (citing Doc. No. 143 at 226–27).

[81] *See* 29 U.S.C. § 1022(a) (stating that summary plan descriptions must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan"); *Martinez*, 338 F.3d at 425 ("[W]henever an employer exercises a fiduciary function, it must speak truthfully.").

accrue under the Plan as early as July 30, 2003, when Viad issued its 2003 summary plan description. This document, MoneyGram argues, informed her that she was no longer an Eligible Employee and therefore no longer accruing service. And second, it disputes that its 2012 and 2014 summary plan descriptions represented that Fracalossi's service continued to accrue under the Plan. In any event, MoneyGram argues that it specifically informed Fracalossi through a benefit summary that it considered June 30, 2002 her severance from service date.

The Court finds that MoneyGram's "failure to correct" the 2003 Viad-issued summary plan description and summary of material modification did not breach any fiduciary duties owed to Fracalossi. This case is not about MoneyGram's misrepresentation or lies in its exercise of a fiduciary function—it is about MoneyGram's failure to disclose a material modification to the Plan that may have affected Fracalossi's benefits. Fracalossi was entitled to rely on the information in Viad's 2003 communications for Plan information and to make her retirement decision. And on their face, the Viad documents contain no misinformation or lies. The core of the problem was not a misrepresentation but a failure to disclose Amendment Four, which is ripe for trial as explained above.

### b. Actual Harm and Causation

In *Amara*, the Supreme Court acknowledged that any recovery under section 1132(a)(3) requires a "showing of actual harm" and causation.[82] As explained in the Court's prior Memorandum Opinion and Order, subsequent Fifth Circuit precedent

---

[82] *Martinez*, 338 F.3d at 444.

teaches that the focus of the actual-harm inquiry is on whether the plaintiff has pled harm in the form of denial of benefits.[83]   Fracalossi correctly pled this harm in her Fourth Amended Complaint as the denial of early retirement payments.[84]   At the summary judgment stage, as the nonmoving party, Fracalossi must now "go beyond the pleadings and establish 'specific facts showing that there is a genuine [dispute] for trial.'"[85]

### i.   Actual Harm

MoneyGram claims that Fracalossi cannot prove harm for two reasons: (1) she is already receiving the full amount of the Plan benefits and (2) her alleged losses are not recoverable under ERISA.   Fracalossi's alleged losses include the loss of opportunity to continue working and to plan for retirement differently, the inability to receive her retirement benefits under the MoneyGram Plan at age fifty-five, and the loss of benefits under the Viad Supplemental Plan from age fifty-five to sixty. Fracalossi claims that her retirement benefits were a package of two income streams: the basic retirement benefits from the MoneyGram Plan and the supplemental benefits from the Viad Supplemental Plan.   Because MoneyGram failed to notify her of Amendment Four, she alleges, she lost five years of monthly payments under both the MoneyGram Plan and the Viad Supplemental Plan.

---

[83] Doc. No. 95 at 10–11.

[84] Doc. No. 103.

[85] *McWhirter v. AAA Life Ins. Co.*, 622 F. App'x 364, 365 (5th Cir. 2015) (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

The Court has already explained that lost opportunity is not a remedy ERISA provides.[86]  But as to her loss of benefits under the two plans, the Court finds genuine disputes of material fact.  For example, Fracalossi's declaration and damages calculation suggests that she was financially harmed by the loss of benefits under both plans from age fifty-five to sixty.[87]  But MoneyGram does not agree that Viad Supplemental Plan losses are recoverable.  So MoneyGram claims that Fracalossi's only claim for loss is for five years of MoneyGram Plan benefits, but because she is now receiving larger monthly payments for life, these damages would constitute double recovery.  On this record, the Court is unable to decide whether Fracalossi's alleged harm meets the "actual harm" standard or whether it fits within appropriate, make-whole relief.[88]

---

[86] Doc. No. 95 at 12 ("Of the various remedies ERISA affords, the chance to keep working and saving for retirement is not one of them.").

[87] MoneyGram urges the Court to disregard Fracalossi's declaration as self-serving and insufficient to defeat summary judgment; however, the Fifth Circuit has held that "[a] non-conclusory affidavit can create genuine [disputes] of material fact that preclude summary judgment, even if the affidavit is self-serving and uncorroborated." *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (citing *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018) (en banc)).  But a conclusory affidavit "cannot preclude summary judgment—whether it is self-serving or not." *Id.* Thus, "self-serving evidence must only comport with the standard requirements of Federal Rule of Civil Procedure 56." *Guzman v. Allstate Assurance Co.*, No. 20-11247, 2021 WL 5228510, at *3 (5th Cir. Nov. 10, 2021).  So "self-serving affidavits and declarations, like all summary judgment evidence must 'be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Id.* (quoting FED. R. CIV. P. 56(c)(4)). The Court finds that the part of Fracalossi's declaration addressing damages meets these requirements and is sufficiently non-conclusory to create a genuine dispute of material fact on the issue of actual harm.

[88] MoneyGram also argues it is not responsible for and does not administer the Viad Corp Supplemental Plan.  But Fracalossi points out that MoneyGram admitted in its answer to Fracalossi's Fourth Amended Complaint that it is financially responsible for a portion of Viad Supplemental benefit payments.  Accordingly, MoneyGram cannot prevail on its conflicting argument at summary judgment.

### ii.   Causation

Even if MoneyGram's 2012 and 2014 summary plan descriptions were misleading, the Court finds that these claims fail on causation. Although detrimental reliance is not an element of breach of fiduciary duty, the Supreme Court in *Amara* noted that plaintiffs must prove actual harm *and* causation.[89] The Fifth Circuit has also previously recognized that there is a "necessary causal link between the misrepresentations and the plaintiffs' eligibility for . . . plan benefits."[90]

As Fracalossi notes, the "bottom line" is that "[b]ut for [Amendment Four], the vested grandfathered benefit would start at age 55 at the option of the participant."[91] Fracalossi retired in 2006, believing she had at least eleven years of service based on communications from Viad up to that point. She claims that had she known about Amendment Four even after she left employment with Viad, she could have made different retirement planning decisions, like purchasing annuities. But this harm— the lost opportunity to make different retirement decisions—is not recoverable. Therefore, the Court finds that Fracalossi's potentially recoverable harm, the loss of benefits, did not "result[] from" any of the alleged misrepresentations in the 2012 or 2014 summary plan descriptions.[92] In contrast, there is a causal link between the

---

[89] *Amara*, 563 U.S. at 444 ("[A] plan participant or beneficiary must show that the violation injured him or her. But to do so, he or she need only show harm and causation.").

[90] *Ferrer v. Chevron Corp.*, 484 F.3d 776, 782 (5th Cir. 2007); *see also Hobbs v. Baker Hughes Oilfield Operations, Inc.*, No. CIV.A. V-06-97, 2007 WL 4223666, at *8 (S.D. Tex. Nov. 28, 2007), *aff'd*, 294 F. App'x 156 (5th Cir. 2008).

[91] Doc. No. 96 at 28.

[92] *See Ferrer*, 484 F.3d at 781.

alleged breach, the failure to disclose, and the injury, the loss of benefits she believed she was eligible for due to MoneyGram's failure to disclose.

Therefore, because the Court finds a dispute of material fact on whether MoneyGram owed Fracalossi a duty to disclose Amendment Four, and if it did, whether Fracalossi was actually harmed by that breach, the Court **DENIES** MoneyGram's motion for summary judgment on Fracalossi's breach of fiduciary duty claim.

### III.    Motions to Strike

The Court next turns to MoneyGram's Motion to Strike Plaintiff's Experts and Rebuttal Experts [Doc. No. 126] and Fracalossi's Motion to Strike, Exclude, or Limit Defendant's Expert Testimony [Doc. No. 130].   For the reasons stated below, the Court **DENIES** Fracalossi's motion to strike and **GRANTS** MoneyGram's motion to strike.

### A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence.   Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."[93]   As a gatekeeper, this Court must permit only reliable and relevant testimony from

---

[93] FED. R. EVID. 702.

qualified witnesses to be admitted as expert testimony.[94]   The party offering the expert testimony has the burden of proof, by a preponderance of evidence, to show that the testimony is reliable and relevant.[95]

Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue.[96]   Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."[97]   Expert testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid."[98] Such testimony must be "more than subjective belief or unsupported speculation."[99]   In other words, this Court need not admit testimony "that is connected to existing data only by the *ipse dixit* of the expert."[100]   The Court also does not need to admit testimony based on indisputably wrong facts.[101]   In conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology.[102]   The

---

[94] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

[95] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[96] *Daubert*, 509 U.S. at 591.

[97] *See Mathis*, 302 F.3d at 460 (applying Rule 401 to expert testimony).

[98] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).

[99] *Daubert*, 509 U.S. at 590.

[100] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[101] *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

[102] *Daubert*, 509 U.S. at 595; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54 (1999).

Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors.[103]  But "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."[104]

### B.    Analysis

#### 1.  MoneyGram's Motion to Strike

MoneyGram moves to strike all of Fracalossi's experts and rebuttal experts. First, MoneyGram claims that Fracalossi's experts and rebuttal experts must be excluded because she failed to comply with Federal Rule of Civil Procedure 26(a). And second, it claims that Fracalossi cannot present her opinions as an expert because she is not qualified to do so under Federal Rule of Evidence 702.  In her response, Fracalossi agrees to reducing her expert list.  As to the agreed experts, the Court **GRANTS** the motion to strike.

The remaining experts MoneyGram challenges are a Corporate Representative of MoneyGram Pension Plan; a Corporate Representative of MoneyGram International, Inc.; Robert Hanula; Al Kopec; and Scott Steele.  Her remaining rebuttal experts include Kimbra Fracalossi (herself); a Corporate Representative of MoneyGram Pension Plan; a Corporate Representative of MoneyGram International, Inc.; Robert Hanula; Al Kopec; and Scott Steele.  Fracalossi also seeks to add

---

[103] The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593–94.

[104] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

MoneyGram's expert witness, Kevin Sullivan, as both an expert and rebuttal expert after the deadline to designate witnesses.

Rule 26(a)(2)(A) requires parties to disclose "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."[105] If the expert witness is not required to provide a written report, the party's disclosure must provide "the subject matter on which the witness is expected to testify" and "a summary of the facts and opinions to which the witness is expected to testify."[106] The advisory committee report notes clarify that Rule 26(a)(2)(C) "mandate[s] summary disclosures of the opinions to be offered by the expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions."[107] While this summary is "considerably less extensive than the report required by Rule 26(a)(2)(B)[,] and [c]ourts must take care against requiring undue detail," "[t]his less extensive disclosure standard . . . does not obviate the need to provide the disclosures expressly required by this rule."[108]

If a party fails to comply with Rule 26, the Court may strike the evidence "unless the failure was substantially justified or is harmless."[109] Exclusion is not

---

[105] FED. R. CIV. P. 26(a)(2)(A).

[106] FED. R. CIV. P. 26(a)(2)(C).

[107] FED. R. CIV. P. 26 advisory committee report notes 2010 amendment.

[108] *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, No. 3:16-CV-2255-L, 2019 WL 1436659, at *7 (N.D. Tex. Mar. 31, 2019) (Lindsay, J.).

[109] FED. R. CIV. P. 37(c)(1).

mandatory but within the Court's discretion.[110]  The Court looks to four factors in deciding whether to exercise its discretion: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose."[111]

MoneyGram contends that all of Fracalossi's summaries are insufficient under Rule 26 and fail to give MoneyGram any notice of what information the experts will testify to and whether these witnesses qualify as experts on this subject matter at all. The Court agrees and finds that Fracalossi has failed to comply with the requirements of Rule 26(a)(2)(C).  Although the parties do not specifically brief the factors set out above, the Court finds that with the approaching January trial date and prejudice to MoneyGram, it is appropriate to strike Fracalossi's experts.  Further, a continuance would not cure any prejudice as Fracalossi has stated that she "does not know what [the experts'] opinions may be at trial."[112]  Therefore the Court **GRANTS** the motion as to Fracalossi's expert witnesses and rebuttal experts: Corporate Representative of MoneyGram Pension Plan; a Corporate Representative of MoneyGram International, Inc.; Robert Hanula; Al Kopec; and Scott Steele.

MoneyGram also objects to Fracalossi's addition of MoneyGram's expert, Kevin Sullivan, after the deadline.  Even if the Court were to allow the addition, Fracalossi

---

[110] *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990).

[111] *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

[112] Doc. No. 133 at 6.

has provided no information about what Sullivan will testify to on her behalf. Therefore, the Court **GRANTS** the motion to strike the addition of Kevin Sullivan as an expert and rebuttal expert.

Finally, Fracalossi listed herself as a rebuttal expert and offered her own calculations as a rebuttal to Kevin Sullivan's expert report on the actuarial value of her pension benefits. MoneyGram moves to strike her testimony under Rule 702 arguing that Fracalossi is unqualified to rebut Sullivan's expert actuarial analysis and that her testimony would not be reliable. Fracalossi has admitted that she is not an expert—she has no education or experience specific to pension plans or actuarial services.[113] Fracalossi rests her expertise in "know[ing] how to do math" and in her experience as CFO of Viad, but she admits that she does not know how to do actuarial accounting.[114] Witnesses can base their expertise on experience, but the Federal Rules explain that if they do so, they "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[115] Fracalossi has the burden of proving that her testimony as an expert is reliable, and she has failed to meet it. Fracalossi may testify to her own damages, but she may not testify as a rebuttal expert to Sullivan's actuarial analysis. The Court **GRANTS** MoneyGram's motion to strike Fracalossi as a rebuttal expert.

---

[113] Doc. No. 126 at 108, 23:3–4.

[114] *Id.* at 110, 100:20–25; 101:1–10.

[115] FED. R. EVID. 702 advisory committee notes 2000 amendments.

### 2. Fracalossi's Motion to Strike

MoneyGram designated Kevin Sullivan as an expert on the actuarial analysis of retirement benefits under the MoneyGram Plan. Fracalossi moves to strike Sullivan's testimony on two grounds. First, she argues that Sullivan is not qualified to address the scope of compensable losses in an ERISA breach of fiduciary duty case.[116] And second, she argues that Sullivan's testimony is not relevant or reliable because it "does not fit the facts" of the case for several reasons. But Fracalossi's arguments are unpersuasive for the reasons below.

MoneyGram retained Sullivan to opine on the actuarial value of the benefits Fracalossi claims to have lost under the MoneyGram Plan, not on the scope of losses available to her under ERISA. Even so, Sullivan cannot opine on the scope of compensable losses or remedies in an ERISA breach of fiduciary duty case because the meaning of "appropriate equitable relief"[117] is a question of law for the Court to decide. An expert witness "may never render conclusions of law."[118]

Sullivan's testimony on the value of benefits under the MoneyGram Plan is relevant and reliable. Sullivan's testimony is relevant because it will assist the Court in determining whether Fracalossi suffered any harm from MoneyGram's alleged breach of fiduciary duty. This is essential to the case because if Fracalossi cannot

---

[116] Doc. No. 130 at 4. Fracalossi clarifies in her Reply that her motion to strike "does not challenge Sullivan's qualifications as an actuary or Sullivan's use of software. It challenges his qualifications to address the scope of compensable losses and remedies in ERISA breach of fiduciary duty cases." *Id*. at 3.

[117] 29 U.S.C. § 1132(a)(3).

[118] *Goodman v. Harris Cnty*., 571 F.3d 388, 399 (5th Cir. 2009).

prove that she was actually harmed, she loses. Sullivan's testimony is also reliable. Because his opinion is being offered for the value of the benefits Fracalossi claims she was wrongfully denied, the reliability of that testimony depends on the methods used to determine the actuarial value of those benefits. In Sullivan's report, he attests that his report was developed using generally accepted actuarial principles and the Actuarial Standards of Practice. Sullivan's report thoroughly explains the method he used to reach his opinion; it is not subjective belief or unsupported speculation. It is based on established methods for actuarial analysis of benefits and years of experience.[119]

Although Fracalossi disagrees with Sullivan's report, his method, and some of his underlying facts and assumptions, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[120] Fracalossi may present these arguments in her cross-examination.[121] The Court therefore **DENIES** Fracalossi's motion to strike the testimony of Kevin Sullivan.

---

[119] *See* Doc. No. 132-1 at 7:16–19, 7:22–8:3 (Sullivan states that he has twenty-seven years of experience "in actuarial calculations, calculating actuarial present value, calculating benefits for participants at normal, early, delayed retirement benefit dates with numerous optional forms of payment.").

[120] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

[121] *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### IV.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** MoneyGram's motion for summary judgment.   The Court **GRANTS** the motion as to Fracalossi's section 1132(a)(1)(B) claim and **DENIES** the motion as to her section 1132(a)(3) claim.  The Court **GRANTS** MoneyGram's motion to strike and **DENIES** Fracalossi's motion to strike.

**IT IS SO ORDERED** this 24th day of November, 2021.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE